**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MUSA HASSAN ALI,

                                CASE NO. 15-14483

        *Plaintiff*,                DISTRICT JUDGE ARTHUR J. TARNOW

*v.*                             MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 18)**

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's entire determination that Ali is not disabled. Accordingly, **IT IS RECOMMENDED** that Ali's Motion for Summary Judgment (Doc. 13) be **GRANTED IN PART** as to the analysis of Listing 3.02A or B but denied in all other respects, that the Commissioner's Motion for Summary Judgment (Doc. 18) be **DENIED IN PART**, and that this case be **REMANDED for further proceedings under Sentence Four of 42 U.S.C. § 405(g)**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner")

denying Plaintiff's claim for a period of disability, Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.*, and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 3; Tr. 1-4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 18).

Plaintiff Musa Hassan Ali was forty-three years old as of July 14, 2014, the date of the ALJ's decision. (Tr. 39, 231). His application for benefits was initially denied on April 12, 2013. (Tr. 119-20). Ali requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Ena Weathers on June 2, 2014. (Tr. 44-75). Ali, represented by attorney Randall Phillips, testified, as did vocational expert ("VE") Don Harrison. (*Id.*). On July 14, 2014, the ALJ issued a written decision in which she found Ali not disabled. (Tr. 17-39). On October 29, 2015, the Appeals Council denied review. (Tr. 8-11). Ali filed for judicial review of that final decision on December 29, 2015. (Doc. 1).

###### B.      Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014)

(internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.   Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.

4

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Ali not disabled under the Act. (Tr. 21). The ALJ found at Step One that Ali had not engaged in substantial gainful activity following the alleged onset date, April 23, 2012. (Tr. 14). At Step Two, the ALJ concluded that Ali had the following severe impairments: "seizure disorder and depression with anxiety." (*Id.*). At Step Three, the ALJ found that Ali's combination of impairments did not meet or equal one of the listed impairments. (Tr. 15-16). The ALJ

then found that Ali had the residual functional capacity ("RFC") to perform light work,

except with nonexertional limitations as follows:

> the claimant can occasionally stoop, crouch, crawl, kneel, and climb ramps
> and stairs; can never climb ladders, ropes and scaffolds; he is able to
> occasionally push and pull with the lower extremity, especially on the right;
> the claimant must avoid concentrated exposure to extreme cold and heat,
> wetness, vibration, fumes, odors, dusts, gases, and poor ventilation; he is
> able to perform simple, routine, and repetitive tasks without strict
> production demands; the claimant requires occasional verbal instruction
> reminders with the introduction of new tasks; and he is [sic] requires the
> ability to change form a standing to a seated position of vice versa for 1-2
> minutes every hour to two hours without interference with work product.

(Tr. 26). At Step Four, the ALJ found that Ali could not return to any past relevant work.

(Tr. 19). At Step Five, the ALJ concluded that Ali retained the ability to perform work

which exists in significant numbers in the national economy. (Tr. 20).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has thoroughly reviewed Ali's medical record. In lieu of summarizing

his medical history here, the Court will make references and provide citations to the

record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

#### a.    Ali's Function Report

Ali completed a function report on January 2, 2013, in which he asserted that he

could not work due to his "diabetes, bak [sic] injury." (Tr. 293). His days consisted of

checking his blood sugar, eating, watching television, and walking around. (Tr. 294). His

sleep was sometimes interrupted by "sharp pain." (*Id*.). As to personal care, Ali had some minor difficulties bathing, shaving, and putting on his shoes. (*Id*.). He sometimes needed reminders to take medication, specifically insulin, and to perform personal grooming. (Tr. 295). He sometimes prepared "easy" meals. (*Id*.). He performed "very little cleaning" roughly once weekly with encouragement from his wife. (*Id*.). Ali did not perform housework because he "either got tired quick or lazy." (Tr. 296). He went outside two to three times weekly, could drive a car, and could go out alone. (*Id*.). He shopped for groceries and did some shopping by mail and by computer. (*Id*.). He had no difficulty handling money. (*Id*.). As to hobbies and interests, he wrote "nothing." (Tr. 297). However, as to social activities, Ali wrote that "everyday" he played online games or chatted online. (*Id*.). He required reminders to attend appointments. (*Id*.). Ali described lacking the desire "to do anything." (Tr. 298). He could not lift "any thing," and checked boxes indicating issues with lifting, squatting, bending, reaching, climbing, seeing, memory, completing tasks, concentrating, understanding, following instructions, and using his hands. (*Id*.). Ali could walk one quarter of a mile without rest, and could resume walking after thirty minutes of rest. (*Id*.). He could pay attention for five minutes, and had some difficulty finishing what he started. (*Id*.). However, Ali could follow spoken instructions without difficulty, and got along well with authority figures. (Tr. 298-99). He had difficulty handling stress, but could sustain changes in routine. (Tr. 299). Ali reported being fired from several jobs once his employers discovered the extent of his disability.

(*Id*.). He exhibited strange behavior during bouts of hypoglycemia. (*Id*.). Ali listed numerous medications, but reported no side effects resulting from those medications. (Tr. 299-300).

### b.       Ali's Testimony at the Administrative Hearing

At the April 21, 2015, hearing before the ALJ, Ali testified via the assistance of an Arabic interpreter. (Tr. 46-47). Ali's attorney asserted that Ali was disabled by reason of disorders of the spine; diabetes with neuropathy, fatigue, and blurred vision; depression; and restrictive lung disease. (Tr. 48). Ali testified that his blood sugar was "hardly ever normal," and was generally significantly elevated. (Tr. 50). Ali could "barely" read and write, but could speak English without difficulty. (Tr. 51). He possessed a current commercial driving license. (*Id*.). Ali stated that he last worked in pizza delivery in "I think 2007 or '08." (*Id*.).

When asked why he was unable to work, Ali stated that he was "always under the care of medical because I'm sick." (Tr. 52). He asserted that he "tried to work," but could not "do a job." (*Id*.). He then corrected himself, noting that his most recent employment was "at Subway . . . actually." (*Id*.). He was fired "all of a sudden" despite finding the work "easy," but he was unsure if they "expect more." (*Id*.). When asked again about why he could not work, Ali asserted that his blood sugar was maladjusted, that he had difficulty walking for more than ten or fifteen minutes, and that he experienced difficulty rising from a sitting position. (*Id*.).

8

Ali noted that he had been taking the depression medication Zoloft for less than one year; he stopped taking it due to side effects including "stomach problems, headaches." (Tr. 54). He reported not being in back pain at the hearing. (Tr. 55). Ali's back pain was usually located in his lower back; Ali asserted that he did not have a problem with sitting per se, but rather only when sitting for greater than forty minutes. (Tr. 55). Ali could "walk, no problem, but not for long;" he could walk for about fifteen minutes before pain and fatigue set in. (Tr. 56). He could stand for about twenty minutes, and could lift a gallon of milk, but could not repeatedly perform that lifting exercise. (Tr. 56-57, 62). Ali sometimes had trouble sleeping because of the need to wake and regularly check his blood sugar. (Tr. 58). He could wake and dress himself without issue. (*Id*.). He sometimes experienced blurriness of the eyes, perhaps resulting from difficulties managing his sugar. (*Id*.). Each morning, Ali experienced numbness in his feet which gradually resolved itself over the course of twenty to thirty minutes. (Tr. 59-60). Ali urinated four to five times nightly. (Tr. 60). He sometimes required emergency insulin shots to regulate his blood sugar following diabetic attacks. (*Id*.). Ali could concentrate sufficiently to watch television, but found himself forgetting plot lines. (Tr. 61).

As to his work history, Ali further clarified that he attempted to work at a pizza shop for "about three weeks," but was fired following a diabetic attack and trip to the hospital. (Tr. 62).

Ali asserted that his breathing was "good when [he] use[d] his inhalers." (Tr. 63). However, he also reported that "[a] lot of times I don't think even they [sic] work." (*Id.*). He used inhalers two to three times per week, but always kept one with him. (*Id.*).

As to depression, Ali stated that he feels confused, desires to "be by [him]self a lot of times," and stays in his room "all day" following arguments. (Tr. 63).

### c.    The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Ali's ability to perform work. (Tr. 64). The ALJ asked several questions regarding Ali's past work, but these questions are not relevant as the ALJ found that Ali was unable to perform any past work, and thus based her unfavorable decision on Ali's ability to complete other work available in the national economy. (Tr. 38, 63-65).

The ALJ asked the VE to assume a hypothetical individual with Ali's age, education, and work experience, and who could perform light work, but with further limitation to "unable to climb ladders, ropes or scaffolds; can occasionally stoop, crouch, crawl, kneel, and climb ramps and stairs; can occasionally push and pull with the lower extremity, especially on the right; must avoid concentrated exposure to extreme cold and heat, wetness, vibration, and fumes, odors, dust, gases, and poor ventilation; is able to perform simple, routine, repetitive tasks without strict production demands; and with occasional verbal instruction reminders with the introduction of new tasks." (Tr. 65-66). The VE found that such a worker could perform work available in the national economy,

10

including the positions of nut and bolt packer (115,000 jobs nationally), laundry checker and sorter (135,000 nationally), and electrical accessories assembler (100,000 nationally). (Tr. 66).

The ALJ then posed a second hypothetical, wherein the worker would be limited as in the first hypothetical, but would also require the ability to "change from a standing to a seated position or vice versa for one to two minutes every hour to two hours without interference with work product." (Tr. 67). The VE found that a so-limited individual would be able to perform nut and bolt packer (with a reduced range of 50,000 jobs nationally), laundry checker and sorter (50,000 nationally), and electrical accessories assembler (50,000 nationally). (Tr. 67-68).

In a third hypothetical, the ALJ added that the worker would be "off task 25 percent of the workday, excluding over breaks, due to fatigue, pain, and the effects of medication." (Tr. 68). The VE found that such a restriction would preclude all competitive work. (*Id*.).

Ali's attorney asked whether, with regard to hypothetical number two, a worker who must not only change position every one or two hours, but who must stretch and walk around during those breaks, could still perform work. (Tr. 69). The VE found that such a restriction would be work-preclusive. (*Id*.).

Ali's attorney also inquired as to the reasoning level required to perform work as an inspector, packer, and assembler. (Tr. 69). Ali's attorney noted that reasoning level

11

two applied, as described in the Classifications of Jobs companion to the DOT, 1992 edition; the VE did not challenge that conclusion. (Tr. 70). Ali's attorney then asked whether jobs requiring reasoning level two would require reasoning above and beyond that provided for by "one/two step simple instructions." (*Id*.). The VE noted that "some of the jobs" may require greater reasoning ability than that permitted by "one to two steps, but not all of them." (*Id*.). However, upon further questioning the VE noted that reasoning level two would exceed the abilities of a worker limited to "simple one/two [step] instructions with the need for reminders." (Tr. 71).

Finally, the VE confirmed that a worker off task more than ten percent of the time would be unemployable, that the inability to lift ten pounds on a continuous basis would not preclude working the jobs identified above, that the inability to stand and walk more than an hour during the course of the day would be work-preclusive, that a worker who must "frequently" rest would be unable to perform any competitive work, that more than one or one and one half absences per month is work-preclusive, and that the worker raising legs to waist level for fifty percent of the workday would be work preclusive. (Tr. 69-73).

###    F.    Governing Law

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

>    When adjudicating a subsequent disability claim with an unadjudicated
>    period arising under the same title of the Act as the prior claim,

> adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring

13

review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond. See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning the latter period, her decision still applies to that period absent the requisite proof. Thus, as applied in this Circuit, the SSR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.") (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009); *cf.*

14

*Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances

existing at the time of the review." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

16

The Court notes that Ali previously applied for benefits and was denied. (Tr. 183, 180-92). The ALJ in this case found that he was bound to accept the prior decision unless new and material evidence was presented; finding such evidence, ALJ Kramzyk did not adopt the findings of that prior decision. (Tr. 113). Neither party argues that the ALJ erred in refusing to adopt the prior ALJ's decision, thus this Court need not further analyze that decision.

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the

17

definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ

"will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Ali v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of*

19

*Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Ali v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the

20

severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i) [D]aily activities;
(ii) The location, duration, frequency, and intensity of . . . pain;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v) Treatment, other than medication, . . . received for relief of . . . pain;
(vi) Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human*

21

*Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.     Analysis

Ali argues in his well-researched and cogently presented brief that the ALJ erred in the following ways: 1) Failing to conclude that Ali meets or equals Listing 3.02; 2) Improperly rejecting the findings of Dr. Mills; 3) Providing insufficient reasons to justify the weight accorded to Dr. Mahmoud, Ali's treating physician; and 4) The ALJ's decision at Step Five is not well supported by the VE's testimony. (Doc. 13 at 13-26).

### 1.     The ALJ Did Not Properly Evaluate Whether Ali Met Listing 3.02A or 3.02B

Ali first argues that the ALJ erred by concluding that he did not meet or equal Listing 3.02. (Doc. 13 at 13-15). Ali references both Listing 3.02A and 3.02B, but discusses in detail only 3.02B. (*Id.*). Regardless, the Court will evaluate whether Ali meets or equals either subsection of that listing.

The regulations specify that "[t]he reported one-second forced expiratory volume (FEV1) and forced vital capacity (FVC) should represent the largest of at least three satisfactory forced expiratory maneuvers." (20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E). Listing 3.00 further provides that

> [t]he volume of air you exhale in the first second of the forced expiratory maneuver is the FEV1. The total volume of air that you exhale during the entire forced expiratory maneuver is the FVC. We use your highest FEV1 value to evaluate your respiratory disorder under 3.02A, 3.03A, and 3.04A, and your highest FVC value to evaluate your respiratory disorder under

22

3.02B, regardless of whether the values are from the same forced expiratory maneuver or different forced expiratory maneuvers.

*Id*. Further, where a FEV1 score is "less than 70 percent of your predicted normal value, we require repeat spirometry after inhalation of a bronchodilator to evaluate your respiratory disorder under these listings, unless it is medically contraindicated." *Id*.

Listing 3.02A provides that a claimant is disabled where he or she produces a FEV1 score "less than or equal to the value in Table I-A or I-B for your age, gender, and height without shoes." Under Listing 3.02B, a claimant is disabled where his or her FVC score is "less than or equal to the value in Table II-A or II-B for your age, gender, and height without shoes."

Rather than reproduce the relevant tables in full, I will cite the figures pertinent to Ali's height; Ali is sixty-seven inches tall.[1] (Tr. 683). Listing 3.02A contains a table which provides that a male claimant of between 66.50 inches and 68.50 inches in height is disabled where he provides a FEV1 score of less than 1.85 in at least three satisfactorily performed forced expiratory maneuvers.

Ali's brief specifically references only one FEV1 figure, produced in August 2013, of 1.44. (Doc. 13 at 13; Tr. 683). Being substantially lower than 1.85, this figure is sufficient to meet Listing 3.02A, provided that it was produced in compliance with the testing requirements listed above, and represents the highest of at least three successfully

---

[1] Elsewhere in the records, Ali was found to be sixty-eight inches tall. (Tr. 623). The Commissioner references the higher figure (Doc. 18 at 7), while Ali's brief references the lower height (Doc. 13 at 14). However, because both of these figures fall into the same 66.50 to 68.50 range, the discrepancy is inconsequential.

performed forced expiratory maneuvers. Yet this record was not interpreted by a physician, and is largely inscrutable to a layperson. The record notes that the FVC and FEV1 values are not reproducible, but provides no indication why. The chart on the left of the record shows only a single line, suggesting that the forced expiratory test was administered only once. (Tr. 683). Yet there is no indication how it was determined that the test was not reproducible where only a single instance of the forced expiratory volume test was completed.

Forced expiratory volume testing was also administered in May 2012. (Tr. 624). That test likewise contains no detail regarding the conditions of testing, nor whether Ali performed more than one forced expiratory maneuver, and remains unsigned by a physician or technician. (*Id*.). As in the test above, it indicates that the FVC and FEV1 values are not reproducible. (*Id*.). That testing revealed a FEV1 value of 3.10, significantly higher than the 1.85 figure demonstrating disability under Listing 3.02A. (*Id*.). A second test was performed on that date, which includes "PRE" and "POST" values, perhaps reflecting Ali's scores before and after the use of a bronchodilator, though this is merely a layperson's guess. (Tr. 623). Ali's test results are substantially lower in the "POST" category; in terms of FEV1, his score dropped from 3.10 in the "PRE" category to only 2.10 in the "POST" category. (*Id*.). No indication is given as to what might explain this drop in test results. Like the earlier records, no signature appears on the document, and it is not accompanied by explanation. (*Id*.).

24

Ali also underwent forced expiratory testing in November 2012, which includes both "PRE" and "POST" values of 3.45 and 3.40 respectively, again representing a drop in test performance. (Tr. 621). Again the record indicates that the results were not reproducible. (*Id*.).

The ALJ's analysis of Ali's forced expiratory testing is brief. She simply notes that "most" of his tests are "not valid under the criteria of the listings" because the results were "consistently not reproducible," "a bronchodilator was not consistently administered and no explanation was provided as to why. If a bronchodilator was administered, there is no indication in the report of the dose and name of the bronchodilator administered," because the specific model and manufacturer of the spirogram was not provided, and because there was "no statement of the claimant's ability to understand directions as well as the claimant's effort and cooperation with the performance of the pulmonary function tests." (Tr. 23-24).

Courts in this circuit have regularly noted that, while it is for the ALJ to weigh the medical evidence, ALJs are not qualified to interpret raw medical data, and may not "play doctor." *See Klump v. Colvin*, No. CV 14-12428, 2016 WL 2747143, at *4 (E.D. Mich. Apr. 26, 2016) ("When determining a claimant's RFC, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.") (quotation omitted), report and recommendation adopted sub nom. *Klump v. Comm'r of Soc. Sec.*, No. CV 14-12428, 2016 WL 2986366 (E.D. Mich. May 24, 2016); *Wheeler v. Comm'r of*

25

*Soc. Sec.*, No. 14-12540, 2015 WL 5461527, at *9 (E.D. Mich. Aug. 14, 2015) ("Nevertheless, courts have stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data."), report and recommendation adopted, No. 14-12540, 2015 WL 5460709 (E.D. Mich. Sept. 17, 2015); *Lenon v. Apfel*, 191 F. Supp. 2d 968, 978 (W.D. Tenn. 2001) ("It is the opinion of the undersigned that the ALJ . . . gave in to the temptation to play doctor in this case.").

The ALJ was quite right in finding that the record of Ali's forced expiratory testing was lacking in detail, provided no indication as to the circumstances of the test, use of a bronchodilator, or other factors which might assist in determining whether he met Listing 3.02A. Yet it is this very lack of clarity and detail which should have prompted the ALJ to seek a physician's analysis of these findings. Ali's forced expiratory test results are indeed vague, including undefined terms like "PRE" and "POST." The ALJ specifically notes that the test results are unclear with regard to whether a bronchodilator was administered, noting that "[i]f a bronchodilator was administered, there is no indication in the report of the dose and name of the bronchodilator administered." (Tr. 23). The ALJ is not permitted to simply discount these results because they are composed of medical jargon, but instead should have sought out an explanation or perhaps further testing which could have corroborated or discounted Ali's earlier testing.

The ALJ's duty to obtain expert assistance in reviewing raw medical data particularly evident where the ALJ's review of the medical evidence produces an interpretation that runs contrary to common sense. Presuming that the terms "PRE" and "POST" refer to the use of a bronchodilator, a lay reading of these results seems to suggest that Ali's ability to perform the forced expiratory maneuvers declined following the use of a bronchodilator, contrary to the expected result. (Tr. 621-623). Furthermore, a physician might be able to explain why, despite results indicating "Very Severe Restriction" during his August 2013 forced expiratory testing, it appears that Ali was not subjected to repeated testing, or why it appears that a bronchodilator was not administered despite being used during prior tests. (Tr. 683). A physician, armed with the knowledge to practice that profession, might be able to make sense out of these unusual results. The ALJ and the undersigned, on the other hand, can merely speculate. Lacking an interpretation of these results by a qualified medical professional, the Court must conclude that the ALJ succumbed to the temptation to "play doctor." The ALJ's decision is consequently tainted by this lay-analysis of Ali's medical records, and I cannot conclude that the ALJ's decision is supported by substantial evidence.

The ALJ's analysis of Listing 3.02B suffers from flaws identical to those identified above. Lacking any medical interpretation of the same, the ALJ was not qualified to interpret the results of Ali's expiratory volume testing as it applies to FVC.

27

## 2.     The ALJ Properly Discounted the Opinion of Dr. Mills

Ali next argues that the ALJ erred by ignoring the finding of Dr. Mills that Ali "does not appear able to do work related activities," improperly discounting Dr. Mills' assessment of a Global Assessment Functioning ("GAF") score of 45[2], and by ignoring Dr. Mills' suggestion that Ali might suffer from dementia. (Doc. 13 at 15) (quoting Tr. 29-30, 410). Ali notes that Dr. Mills' findings were corroborated by those of Dr. Lingam, who also assessed a GAF score of 45 (Doc. 13 at 16, Tr. 695-713), and Dr. Bray, who *inter alia* noted possible dementia (Doc. 13 at 16, Tr. 648).

The issue of disability is reserved to the Commissioner, 20 C.F.R. § 404.1527(d), therefore a physician's statement on the issue of disability is entitled to no weight whatsoever. However, as Ali aptly points out, under SSR 96-5p the "opinions from any medical source about issues reserved to the Commissioner must never be ignored, and that the notice of the determination or decision must explain the consideration given to the treating source's opinion(s)." SSR 96-5p, 1996 WL 374183 (1996).

It is clear from the ALJ's decision that she thoroughly considered the findings of Dr. Mills, even though she did not specifically acknowledge that physician's statement on disability. The ALJ considered all of the pertinent findings of Dr. Mills over the course of a lengthy paragraph of analysis. (Tr. 29-30). The ALJ did not later discuss the weight

---

[2] According to the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), a GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed., 2013) [hereinafter DSM–IV].

assessed to Dr. Mills' findings in the section of the decision dealing with opinion evidence (Tr. 35-37), but her thorough review of Dr. Mills' other findings suggests that she fully considered Dr. Mills' report.

While the ALJ did not discuss the weight accorded to Dr. Mills' statement on disability, and thus did not perfectly comport with SSR 96-5p, this error (if it can be called error) is harmless. The ALJ explained in a thorough manner why she believes Ali is capable of work despite his mental ailments, and thus implicitly discounted Dr. Mills' finding that Ali would be incapable of work. This assessment was sufficient particularly given that Dr. Mills was not a treating physician, but rather acted merely as a consultative physician. *See Marvin v. Comm'r of Soc. Sec.*, No. 3:11 CV 2170, 2012 WL 7110364, at *8 (N.D. Ohio Dec. 19, 2012) (finding harmless an ALJ's failure to consider a treating physician's opinion that the patient was disabled because the opinion was not well supported and because the issue of disability is reserved to the Commissioner), report and recommendation adopted, No. 3:11 CV 2170, 2013 WL 518721 (N.D. Ohio Feb. 12, 2013).

Furthermore, Dr. Mills' opinion on the issue of disability is not well supported, and thus arguably is "so patently deficient" that the ALJ was not obliged to consider it in the first place. *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)). Dr. Mills does not tie her opinion that Ali could not work at that time to any particular finding in

29

her report, leaving the reader to speculate as to which of her findings might support that conclusion. (Tr. 410). For instance, while she concludes that he "doesn't remember things that he was told by family members" and "gets paranoid when his blood sugar is too low," it is by no means evident that these conclusions support a finding of disability. (*Id.*). Therefore the ALJ either did not err in choosing not to discuss Dr. Mills' statement that Ali was disabled from work, or if she did err, that error was harmless.

Ali also argues that the ALJ improperly discounted Dr. Mills' assessment of a GAF score of 45. (Doc. 13 at 16). The Sixth Circuit recently discussed GAF scores as follows:

> We take a case-by-case approach to the value of GAF scores. Previously, we have refused to find that a low GAF score established that the ALJ's decision was not supported by substantial evidence where the ALJ had reason to doubt the credibility of the assigning source; the claimant had conflicting GAF scores; the GAF scores were not accompanied by a suggestion that the claimant could not perform any work; substantial evidence supported the conclusion that the claimant was not disabled; and the VE testified that an individual with the claimant's limitations could still perform a number of jobs. *See Kornecky* [v. Commissioner of Social Security], 167 Fed. Appx. 496, 511 (6th Cir. 2006). On the other hand, we have looked to consistency among low GAF scores to determine that an ALJ minimized the severity of a claimant's symptoms and failed to provide good reasons for assigning limited weight to a treating doctor's opinion.

*Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016). Notably, GAF scores have been eliminated by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, published in 2013. *See Massey v. Comm'r of Soc. Sec.*, No. 1:15-CV-744, 2016 WL 4987169, at *15 (S.D. Ohio Sept. 15, 2016). Nevertheless, while GAF scores are

30

"'not essential to the RFC's accuracy,' [they] nevertheless 'may be of considerable help to the ALJ in formulating the RFC.'" *Miller*, 811 F.3d at 836 (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

To determine the value of Dr. Mills' GAF score in this case, we must thus look to the remainder of Ali's mental health records. As described by the ALJ, Ali appears to lead a life relatively unimpaired by mental illness. At the hearing before the ALJ, Ali asserted that he was disabled from work by physical ailments rather than diseases of the mind. (Tr. 52). He complained of difficulties standing, sitting, maintaining his blood sugar, breathing and frequently urinating, but had precious little to say about his mental health. (Tr. 54-63). He described using the anti-depressant Zoloft, but ceasing use of that medication due to side effects. (Tr. 54). He also asserted that he desired to be alone "a lot of times," and sometimes stays in his room "all day" following arguments. (Tr. 63). These relatively mild complaints do not suggest a disabling mental impairment.

Ali's function report likewise primarily discusses physical ailments, including those relating to diabetes and back pain. (Tr. 293-94). While he did not perform much housework, this resulted from becoming "tired quick or lazy" rather than mental ailments. (Tr. 296). He went outside regularly, could go out alone, drove himself, did his own shopping, and played online games and chatted online daily. (Tr. 297-98). While Dr. Mills' assignment of a GAF score of 45 would suggest "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious

31

impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)," DSM-IV-TR at 34, Ali's description of his mental wellbeing does not conform to these descriptors. While Ali asserted that he had no social interactions outside of his family, the ALJ aptly points to medical records in which Ali admitted to smoking marijuana socially with friends. (Tr. 25, 711).

This is not to say that Ali was the picture of mental health. In January 2014 Dr. Lingam noted complaints of dementia-like symptoms, including occasionally hearing a hallucinated "knocking on the door or . . . a voice downstairs." (Tr. 711). Dr. Lingam assessed a GAF score of 45, but did not provide an assessment as to why this score was merited. (Tr. 713). Dr. Lingam's check-the-box findings generally indicate that Ali was "normal," "appropriate," and "within normal limits" for all categories except grooming, which was merely "average." (Tr. 711-13). In April 2014 reviewing agency physician Dr. Story recommended that the Commissioner "obtain a Wechsler Memory Scale III or IV to assess level of [dementia related] impairment." (Tr. 92). In March 2013 therapist and social worker John Jeter concluded that Ali had symptoms suggesting "[p]ossible [d]ementia," and noted memory problems, but suggested that these resulted from depression rather than dementia. (Tr. 648). Jeter assessed a GAF score of 64.[3]

---

[3] A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia)" or "some difficulty in social, occupational, or school functioning...but generally functioning pretty well." DSM-IV at 34.

32

While the ALJ did not specifically discuss the GAF scores rendered by Drs. Mills and Lingam, she thoroughly reviewed and discussed their findings. (Tr. 29-30, 32). In sum, while there is some consistency between Drs. Mills and Lingam's assessment of a GAF score of 45, the evidence of record, including Ali's own testimony, does not support a finding that he was as mentally limited as that score would suggest. I further note, as did the ALJ, that Ali's use of Zoloft appeared to reduce his depressive symptoms over time. (Tr. 35, 674, 693-716). Particularly where Ali's overall mental health record and testimony suggests that he lives a life generally unimpeded by mental health symptoms, I cannot find that the ALJ erred by neglecting to specifically discuss and consider Ali's GAF scores.

Ali also points to several medical records wherein physicians suggested that his symptoms were indicative of possible dementia. (Doc. 13 at 8, 10, 13, 15-16). He also recognizes that the ALJ specifically discussed these records. (*Id*. at 15). Ali does not specifically assert that the ALJ erred in her consideration of Dr. Mills' findings by insufficiently discussing the diagnosis of possible dementia. However, he does clearly assert in a latter section of his brief that the ALJ's RFC insufficiently accounted for his memory deficits associated with dementia. (Doc. 13 at 24-25). I will therefore address Ali's argument where it is appropriate in a section below.

33

### 3.    The ALJ Properly Discounted the Opinion of Dr. Mahmoud

Next, Ali argues that the ALJ erred by discounting the opinion of Dr. Mahmoud, who concluded that Ali's diabetes and back pain rendered him disabled. (Doc. 13 at 17). More particularly, Dr. Mahmoud found that Ali could lift only five pounds occasionally, could sit for one hour per workday, stand and walk less than one hour per workday, could not push or pull arm or leg controls bilaterally on a regular and sustained basis, would require more than twenty minutes of rest per hour, needed to lie down for a large portion of the workday, needed to elevate his legs for fifty percent of the workday, and would be unable to work a regular week. (Tr. 36). The ALJ discounted this opinion on the ground that Dr. Mahmoud's findings were not well supported by his treatment notes, which were largely nominal. (Tr. 36-37). The ALJ noted potential causes for the disparity between this opinion and treatment notes, including a desire to help the patient, the doctor's uncritical recitation of the patient's complaints, or the patient's insistence on the doctor producing a favorable opinion. (Tr. 37).

Ali counters that Dr. Mahmoud in fact "consistently documented findings of elevated blood sugar and AIC levels in his records and the diagnosis of uncontrolled diabetes mellitus" along with EMG testing which demonstrated neuropathy. (Doc. 13 at 19). Ali asserts that these findings fully support Dr. Mahmoud's opinion regarding fatigue, weakness, his inability to stand or walk for extended periods of time, and his need to elevate his legs. (*Id*.).

34

Ali also notes that the ALJ appears to reject Dr. Mahmoud's opinion primarily because that physician did not regularly record maladies of the back or spine, yet rendered an opinion which suggests that Ali would be disabled in part due to his back ailments. (Doc. 13 at 19). Ali's brief thoroughly scours the record, noting that Drs. Elthaway and Shidyak found ailments of the spine, including disc dessication, loss of disc height, arthropathy, and canal stenosis, along with the existence of neuropathy of the feet, positive straight leg raise test, reduced flexibility, and a wide gait, and diabetes-related conditions. (Doc. 13 at 20).

The Commissioner counters with an equally extensive recitation of the record, noting that Dr. Mahmoud repeatedly recorded no issues with his back, neck, legs, or eyes, and that his mood, gait, and stance were consistently normal. (Doc. 18 at 27). The Commissioner further notes that the other evidence of record to which Ali actually points actually tends to undercut the reliability of Dr. Mahmoud's findings. She notes that Dr. Elthaway's examination showed largely normal results, with merely moderate back pain, and that Dr. Shidyak found Ali was only mildly limited in terms of physical activity. (*Id*.).

Both parties' arguments are well supported and well reasoned. It is true that Dr. Mahmoud's opinion provides for a substantial degree of limitation, much of which appears to result from his finding that Ali suffered from significant back ailments. It is likewise true that while Dr. Mahmoud's treatment notes do not regularly document

35

complaints of back pain, the objective findings of other physicians provide some evidence for diagnosable back ailments. Yet as always, it is not the mere diagnosis of an ailment which counts, but the degree to which that ailment impairs the claimant's ability to perform work. "The mere diagnosis of arthritis, of course, says nothing about the severity of the condition." *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx. 771, 779 (6th Cir. 2008). Dr. Elthaway's finding of mild loss of disc height, mild canal stenosis, moderate degenerative disc disease, and mild canal stenosis without radiculopathy might reasonably produce some degree of pain and impairment. Yet Dr. Eltahawy recorded that Ali experienced only "moderate" pain, and recommended the conservative treatments of physical therapy and epidural injections, with "surgical intervention as a last resort." (Tr. 405). While these findings are not inconsequential, neither do they appear consistent with Dr. Mahmoud's finding that Ali could lift only five pounds occasionally, would require twenty to thirty minutes of rest per hour of work, would need to elevate his legs, could stand or walk for one hour per workday, sit for one hour per workday, and would need to lie down for a substantial portion of the workday. (Tr. 689).

Furthermore, were Ali so severely limited, one might reasonably expect that he would have sought treatment from Dr. Mahmoud, his primary care physician, for his back ailments. Ali's failure to treat with Dr. Mahmoud despite his allegedly disabling back pain, combined with Dr. Elthaway's relatively mild findings, strongly supports the ALJ's

conclusion that Dr. Mahmoud's opinion merits little weight. This conclusion is further strengthened by Dr. Shidyak's findings, which likewise revealed evidence of some mild to moderate back pain, falling far below the allegedly disabling level assessed by Dr. Mahmoud. (Tr. 414-16).

Because Dr. Mahmoud's opinion regarding Ali's back-related limitations was not well supported by the record, I find that the ALJ did not err in discounting the value of that physician's opinion.

### 4.      The ALJ Properly Evaluated Ali's Credibility

Ali next argues that the ALJ erred in evaluating his credibility. (Doc. 13 at 20-22). The ALJ's credibility determination is given significant deference, and a claimant challenging that determination faces an uphill climb. *See Sims*, No. 09-5773, 2011 WL 180789, at *4. This is particularly true where, as here, the ALJ provides numerous reasons for their credibility assessment. The ALJ concluded that Ali was not entirely credible for the following reasons: i) treatment notes indicated that his treatment for mental and physical ailments suggested his treatment was relatively effective in reducing symptoms; ii) Ali inconsistently reported his work history; iii) Ali did not follow-up with care providers or follow his prescribed treatments; iv) Dr. Mahmoud's treatment notes describe Ali's physical condition as generally nominal; v) Ali took pain relieving medication only a few times per week; vi) Ali abused alcohol but was not always forthright about this addiction when speaking to physicians; vii) Ali's use of alcohol and

37

marijuana potentially undercut physician-recommended therapies; viii) Ali did not require emergency medical treatment for his mental health issues; ix) Ali's use of the anti-depressant Zoloft appeared to ameliorate his depression, and despite not following that prescribed regimen consistently, his depression seemed to improve with time. (Tr. 33-35).

In this face of this mountain of evidence, Ali argues that his self-reported work history is in fact consistent with the record evidence, and that the ALJ has simply misinterpreted Ali's somewhat vague testimony. (Doc. 13 at 21-22). Ali also notes that he suffers from memory issues, either resulting from his diabetes or dementia, thus inconsistent recollection of his work history actually supports his allegations. (*Id.* at 22). Ali also notes that he has "not hidden his occasional drinking," and argues that this self-medication further suggests the disabling extent of his mental ailments. (*Id.*).

Ali appears correct that the ALJ has overstated the case against Ali insofar as his work history is concerned. At the hearing before the ALJ, Ali asserted that he last worked as a pizza deliveryman in 2007 or 2008, "I think." (Tr. 51). Yet shortly thereafter he admitted to working at Subway more recently, adding the word "actually" at the end of his sentence, suggesting that he suddenly recalled his more recent work history. (Tr. 52). This explains most, if perhaps not all, of the work record inconsistencies found by the ALJ. In any case, Ali is quite correct that the record supports his allegedly faulty

38

memory, including findings of possible dementia and findings that his diabetes negatively impacted his memory. (Tr. 92, 409-10, 647-48, 708).

Ali's argument relating to alcohol use is less well taken. Even assuming that his alcohol use was done as a method of self-medication, it is without dispute that he declined to follow he was instructed by physicians to engage in "[t]otal abstinence from alcohol and attend AA meetings." (Tr. 695). Ali's allegation that his "self-medication" "was not a failure to follow prescribed treatment, and as a logical matter did not significantly detract from Mr. Ali's allegations" is thus clearly incorrect. (Doc. 19 at 7).

Yet even eliminating the ALJ's arguments regarding alcohol use and Ali's self-reported work history, she identified numerous and substantial reasons for questioning Ali's credibility. That Ali does not even attempt to refute the other seven reasons provided for doubting his veracity is demonstrative. That Ali's treatments were generally effective, that his more recent medical records showed improvement in mental and physical symptoms, that his use of pain relieving and depression reducing medications was inconsistent but effective, and that he did not consistently follow physician-recommended treatments are all good reasons to doubt the veracity of Ali's complaints. Particularly when considered in the deferential light accorded to ALJ credibility findings, these reasons are more than sufficient to justify the ALJ's credibility determination.

### 5.    The ALJ's Decision is Well Supported by the VE's Testimony

Finally, Ali argues that the ALJ's decision is not properly supported because the VE's testimony was in response to an improper hypothetical, because the jobs identified by the VE require a degree of reasoning beyond Ali's abilities, and because VE testimony suggests he would be unable to perform work. (Doc. 13 at 22-26).

Ali is correct that the ALJ specified that he could perform simple work limited to one to two step instructions with the need for reminders, and that the VE concluded a worker with this level of reasoning would be unable to perform jobs which require "reasoning level 2" as provided for in the DOT. (Doc. 13 at 23). Ali concludes that because two of the three jobs identified by the VE would require work at "reasoning level 2," the ALJ has failed to identify a significant number of jobs available in the national economy at Step Five. Yet the VE also identified the job of nut and bolt packer in response to the ALJ's final hypothetical, which requires only "reasoning level 1;" there were 50,000 such positions available in the national economy. (Tr. 67-68). The Commissioner correctly notes that this number of jobs is more than sufficient to constitute a "significant number" available in the national economy. *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 904 (6th Cir. 2016) (finding 6,000 jobs in the national economy to be a significant number). Ali's argument to the contrary is thus without merit.

40

Ali also argues that, because the ALJ assessed "moderate" limitations to Ali's concentration, persistence, or pace abilities, she should have correspondingly included restrictions in the RFC accommodating for those limitations. (Doc. 13 at 24-26). The ALJ's RFC provides that Ali required "simple, routine, repetitive tasks without strict production demands," and with "occasional verbal instruction reminders with the introduction of new tasks." (Tr. 65-66). This argument is frequently raised and "case law resolves it both ways." *Hernandez v. Comm'r of Soc. Sec.*, No. 10–cv–14364, 2011 WL 4407225, at *9 (E.D. Mich. Aug. 30, 2011). In some cases courts will remand when an ALJ's "hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks," but "other cases have found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation." *Taylor v. Commissioner of Soc. Sec.,* No. 10–CV–12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011), Report & Recommendation adopted, No. 10–12519, 2011 WL 2682892 (E.D. Mich. July 11, 2011). "[T]here is no bright-line rule requiring remand" in these circumstances. *Roberts v. Comm'r of Soc. Sec.,* No. 10–cv–14064, at *8 (E.D. Mich. Aug. 8, 2011), *Report & Recommendation adopted by* 2011 WL 4406344, at *1 (E.D. Mich. Sept. 22, 2011). Instead, "this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Id*.

41

In this case, the record as a whole suggests that the ALJ adequately addressed Ali's CPP restrictions in her RFC finding. Ali relies primarily on the opinion of Dr. Story, a state reviewing doctor of psychology, for the conclusion that he suffered from moderate CPP restrictions. (Doc. 13 at 10). Yet Dr. Story found that Ali could be restricted to "work where duties are relatively static and changes can be explained and adjusted to over time," and found that Ali "would be unable to deal with the stress of multi-step, detailed, or technical/complex tasks, but can handle the ordinary expectations associated with simple work activities when work demands are within MRFC restrictions." (Tr. 99, 116). The ALJ gave this opinion "more than partial weight" and incorporated the limitations proposed by Dr. Story into the RFC finding. (Tr. 26). Given that the ALJ fully incorporated Dr. Story's proposed restrictions, Ali cannot argue that the ALJ insufficiently accounted for the moderate limitations proposed by that physician. Furthermore, the other evidence of record supports the ALJ's RFC finding. Dr. Bray concluded that Ali could "comprehend and carry out simple directions and perform repetitive, routine simple tasks" without difficulty, but would have "mild difficulty" in comprehending complex tasks. (Tr. 648). Because the ALJ limited Ali to "simple, routine, and repetitive tasks without strict production demands," Dr. Bray's findings also support the RFC. (Tr. 26). Ali does not point to any physician's opinion suggesting that he would have CPP limitations beyond those accounted for in the ALJ's RFC.

42

Consequently, the ALJ adequately addressed Ali's CPP limitations, and no error can be found on this point.

Finally, Ali asserts that he should be found disabled because the VE concluded that a worker who was off task twenty-five percent of the workday would be unemployable. (Doc. 13 at 25-26). No physician suggested that Ali would be unable to maintain concentration for twenty-five percent of the workday, and Ali has presented no other support for this extreme degree of limitation. The ALJ was therefore quite right in choosing not to include this restriction in the RFC. No error can be found here, either.

In sum, the ALJ properly discounted the opinion of Dr. Mills and Dr. Mahmoud, discounted the credibility of Ali's testimony, and rendered a decision well supported by the VE's testimony. However, because the ALJ passed judgment on Ali's argument for disability under Listing 3.02A and 3.02B without first obtaining a physician's interpretation of the raw medical evidence in the record, I find that the ALJ's decision is not supported by substantial evidence, and should be remanded. Specifically, I recommend that the ALJ's decision be remanded for further proceedings under Sentence Four of 42 U.S.C. § 405(g) to determine whether his medical records support his claim of disability under Listing 3.02A and 3.02B, and to obtain any additional medical opinions necessary to render that judgment.

**H.    Conclusion**

For the reasons stated above, the Court **RECOMMENDS** that Ali's Motion for Summary Judgment (Doc. 14) be **GRANTED IN PART** as to the analysis of Listing 3.02A or B but denied in all other respects, that the Commissioner's Motion (Doc. 16) be **DENIED IN PART**, and that this case be **REMANDED for further proceedings under Sentence Four of 42 U.S.C. § 405(g)**.

**III.    REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Ali v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to

44

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 20, 2017          S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 20, 2017          By s/Kristen Castaneda
                                       Case Manager